IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHAEL MELGAARD,

                Plaintiff,

v.

WISCONSIN DEPARTMENT OF NATURAL
RESOURCES, BRYAN HARRENSTEIN, and
JEREMY PEERY,

                Defendants.

OPINION and ORDER

24-cv-561-jdp

---

Plaintiff Michael Melgaard was a lieutenant conservation warden for defendant Wisconsin Department of Natural Resources. Melgaard testified in support of his colleague's age and sex discrimination complaint against DNR, and he alleges that DNR retaliated against him because of it.

Melgaard brings First Amendment retaliation claims under 42 U.S.C. § 1983 against his supervisors at DNR, defendants Bryan Harrenstein and Jeremy Peery. He also brings a retaliatory hostile work environment claim against DNR under Title VII of the Civil Rights Act of 1964. He seeks compensatory and punitive damages.

Defendants move for summary judgment, Dkt. 26, and the court will grant their motion. Melgaard's First Amendment retaliation claims are barred by sovereign immunity because he seeks damages arising from his employment with the state. His Title VII claim fails on the merits because he has not shown that DNR's conduct was so severe or pervasive that it altered the terms and conditions of his employment.

BACKGROUND

In 2017, defendant Wisconsin Department of Natural Resources hired plaintiff Michael Melgaard as a lieutenant conservation warden for its Division of Public Safety and Resource Protection. In October 2020, Melgaard competed for a promotion to a captain regional warden position. One of Melgaard's coworkers also sought the promotion. Neither Melgaard nor his coworker received the promotion. Instead, defendant Bryan Harrenstein was promoted to captain and became Melgaard's immediate supervisor. Defendant Jeremy Peery became Harrenstein's supervisor. After Melgaard did not receive the promotion, he filed an age discrimination complaint against DNR with Wisconsin's Equal Rights Division. Melgaard's coworker also filed an age and sex discrimination complaint against DNR. Melgaard supported his coworker in her decision to file the complaint and in her prosecution of it.

Melgaard's decision to support his coworker's discrimination complaint is the protected activity at the core of this lawsuit. He contends that he was retaliated against for this protected activity in three ways: he was (1) investigated for possibly violating DNR's COVID-19 policies; (2) issued a Letter of Expectations explaining these policies and advising him of his work responsibilities; and (3) given a negative performance review, part of which referenced his violation of the COVID-19 policies.

A. Investigation

In the fall of 2021, following a lack of staff compliance with DNR's COVID-19 safety protocols, DNR decided that further reports of violations needed to be investigated. On November 15, 2021, a member of DNR leadership issued a memorandum to all conservation wardens stating that "employees traveling by motor vehicle must ride alone in vehicles," unless a safety issue made driving separately impossible. Dkt. 45, ¶ 52.

2

On November 16, 2021, Melgaard told Harrenstein over the phone that he was riding in a vehicle with another conservation warden. After the phone call with Melgaard, Harrenstein contacted Human Resources about Melgaard's potential violation of the COVID-19 policies. He spoke with Andrea Augle, an employment relations specialist, who determined that an investigation was warranted. DNR investigated Melgaard's conduct from mid- to late-December 2021. On January 2, 2022, Harrenstein, Augle, and Peery met regarding the investigation. They determined that no formal disciplinary action against Melgaard was necessary. The next day, Melgaard received a letter confirming DNR's decision.

**B.   Letter of Expectations**

On February 4, 2022, DNR issued Melgaard a Letter of Expectations. These types of letters are not considered to be disciplinary, and they do not affect an employee's cumulative disciplinary record. Harrenstein drafted it. Melgaard's Letter of Expectations provided him additional guidance regarding DNR's COVID-19 policies and DNR's expectations for him in his supervisory role.

**C.   Performance review**

On September 30, 2022, Harrenstein reviewed Melgaard's performance for the 2021–22 year. Melgaard received all "Solid Performance" and "Exceeds Expectations" ratings for the individual performance objectives. But he received "Progress Necessary" ratings for three DNR performance objectives, apparently a further consequence from the COVID-19 policy problem. To explain Melgaard's "Progress Necessary" rating, Harrenstein wrote: "During this review period Mike made a decision that went against guidance provided by Division/Dept. leadership. Mike did not take ownership of this decision when the mistake was addressed and attributed his mistake to unclear guidance." *Id.*, ¶ 136.

3

Melgaard filed a rebuttal to the performance review with the Bureau of Human Resources. He contended that the performance review contained inaccuracies and untrue claims, and he requested that the "Progress Necessary" ratings be changed to "Solid Performance" ratings. On December 23, 2022, the Bureau rejected Melgaard's rebuttal and determined that the performance review was justified.

On March 7, 2023, Melgaard emailed Harrenstein that he was retiring. Before Melgaard retired, Harrenstein conducted a final performance review for Melgaard. The final performance review included all "Successful Performance" ratings. Melgaard's last day of work at DNR was March 27, 2023. He officially retired on January 9, 2024.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Melgaard brings First Amendment retaliation claims against Harrenstein and Peery under § 1983. He also brings a retaliation claim against DNR under Title VII. Melgaard contends that defendants took three actions against him in retaliation for supporting his coworker's discrimination complaint. Melgaard concedes that none of these actions are sufficient on their own to support a retaliation claim. But he argues that they had the cumulative effect of creating a retaliatory hostile work environment.

Defendants move for summary judgment on the entire complaint. Dkt. 26. This court will grant their motion if the material facts are undisputed and defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court will view the summary judgment evidence in the light most favorable to Melgaard and draw all reasonable inferences in his favor. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 908 (7th Cir. 2022). But it is Melgaard's burden to

4

provide sufficient evidence for a jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## A. First Amendment retaliation claims against Harrenstein and Peery

Defendants raise a threshold issue: whether Melgaard's First Amendment retaliation claims against Harrenstein and Peery are barred by sovereign immunity. *See* Dkt. 31, at 10–13. The court need not address the merits of Melgaard's First Amendment retaliation claims because the sovereign immunity issue is dispositive.

### 1. Sovereign immunity principles

Sovereign immunity is "the privilege of the sovereign not to be sued without its consent." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253 (2011). The Eleventh Amendment recognizes this privilege and generally prohibits private parties from suing states in federal court absent their consent. *See Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 520 (7th Cir. 2021); *Gerlach v. Rokita*, 95 F.4th 493, 498 (7th Cir. 2024).

There is an exception: Congress may abrogate the states' sovereign immunity by exercising its power under the Fourteenth Amendment to authorize such lawsuits. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Congress abrogated the states' sovereign immunity when it enacted Title VII. *See Nanda v. Bd. of Trs. of Univ. of Ill.*, 303 F.3d 817, 831 (7th Cir. 2002). But it did not do so when it enacted § 1983. *See Quern v. Jordan*, 440 U.S. 332, 342–44 (1979). As a result, states cannot be sued under § 1983 without their consent. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66–67 (1989).

A state's sovereign immunity extends to state officials when they are sued in their official capacity because those lawsuits are "against the official's office," and so, are "no different from a suit against the State itself." *Id.* at 71. In contrast, private parties can typically

5

sue state officials in their individual capacities without raising sovereign immunity concerns. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991).

But even when private parties sue state officials in their individual capacities, courts must consider whether those claims "demonstrably [have] the identical effect as [claims] against the state." *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001) (emphasis omitted); *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984). Individual-capacity claims are effectively against the state when the state would (or should) pay a judgment in the plaintiff's favor. *See Gerlach*, 95 F.4th at 501; *Lenea v. Lane*, 882 F.2d 1171, 1178 (7th Cir. 1989). If a plaintiff's individual-capacity claims are effectively against the state, sovereign immunity bars those claims, *Luder*, 253 F.3d at 1023, and courts must dismiss them without prejudice, *see McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 532–35 (7th Cir. 2022); *Morgan v. Fed. Bureau of Prisons*, 129 F.4th 1043, 1052 (7th Cir. 2025).

**2. Seventh Circuit caselaw**

A pair of Seventh Circuit cases illustrates the principle that individual-capacity claims are effectively claims against the state itself, and thus barred by sovereign immunity, when they seek to recover the benefits of state employment.

Consider first the Seventh Circuit's decision in *Omosegbon v. Wells*, 335 F.3d 668 (7th Cir. 2003). In that case, Indiana State University chose not to renew Omosegbon's contract as an untenured junior faculty member. *Omosegbon*, 335 F.3d at 671. As most relevant here, Omosegbon sued university officials in their individual capacities under § 1983, contending that they deprived him of his rights to due process and academic freedom. *See id.* at 671–73. The Seventh Circuit held that Omosegbon could not bring claims under § 1983 against these individuals in their individual capacities. *See id.* at 673. The court reasoned that Omosegbon

6

sought "backpay and other forms of monetary compensation based on an employment contract," and the university officials were not "parties to the contract in their individual capacity." *Id.* The court concluded that it was "inescapable that any resulting judgment will be paid by the state rather than the individual defendants," so Omosegbon's claims against the university officials were not bona fide individual-capacity claims. *Id.*

Second, consider the Seventh Circuit's decision in *Haynes v. Indiana University*, 902 F.3d 724 (7th Cir. 2018). The plaintiff in *Haynes*, an assistant professor at Indiana University, lost his bid for tenure. *Haynes*, 902 F.3d at 728. As most relevant here, Haynes sued university administrators in their individual capacities under 42 U.S.C. § 1981, contending that he was denied tenure because of his race. *See id.* at 729. The Seventh Circuit held that Haynes's individual-capacity claims against the university administrators were barred by sovereign immunity. *See id.* at 732. The court reasoned that *Haynes* was "materially the same" as *Omosegbon* because the university administrators "were not parties to Haynes's employment contract in their individual capacities," so the court had "no reason to believe that they, rather than the University, would foot the bill for a resulting judgment." *Id.*

This court recently applied *Omosegbon* and *Haynes* in its decision in *Hoffman v. Board of Regents of University of Wisconsin System*, No. 23-cv-853-jdp, 2025 WL 1504376 (W.D. Wis. May 27, 2025). The plaintiff in *Hoffman*, a white woman, was appointed as the interim director of the University of Wisconsin–Eau Claire's Multicultural Student Services department. *See Hoffman*, 2025 WL 1504376, at *1–2. Hoffman's supervisor removed her from this interim position after her appointment was criticized by students, faculty, and staff; Hoffman was also transferred to another department and removed as an instructor of a general education course. *See id.* at *2–3. As most relevant here, Hoffman sued the university's chancellor and its

7

affirmative action coordinator, asserting hostile work environment, discrimination, and retaliation claims against them under § 1981 and § 1983. *See id.* at *3. This court held that Hoffman's individual-capacity claims were barred by sovereign immunity. *See id.* at *4. This court reasoned that Hoffman's individual-capacity claims were "identical to *Omosegbon* and *Haynes* in all material respects, because she assert[ed] that [the chancellor] and [the affirmative action coordinator] denied Hoffman employment opportunities she would have received *from the state* in the absence of race discrimination." *Id.* at *5.

An underlying principle drives the sovereign immunity analysis in *Omosegbon*, *Haynes*, and *Hoffman*: sovereign immunity bars a state-employed plaintiff from bringing individual-capacity claims against state-employed supervisors or coworkers who deprived him of rights, benefits, or opportunities arising from his employment relationship with the state. In those circumstances, plaintiffs do not bring bona fide individual-capacity claims against individual defendants; instead, the claims are effectively against the state itself because they seek to recover the value of their state employment. The court will apply this principle to this case.

### 3. Application to Melgaard's case

Melgaard contends that Harrenstein and Peery retaliated against him for supporting his coworker's discrimination complaint, violating his First Amendment rights. *See* Dkt. 41, at 11–20. But Melgaard's substantive argument is that his employment relationship with the state entitled him to a retaliation-free work environment, and his work environment would have been free from retaliation if not for Harrenstein and Peery's actions. Melgaard's individual-capacity claims against Harrenstein and Peery are identical to those in *Omosegbon*, *Haynes*, and *Hoffman* in all material respects—Melgaard, a state employee, seeks damages from other state

8

employees because they interfered with his employment. As a result, his First Amendment retaliation claims against Harrenstein and Peery are barred by sovereign immunity. The court will dismiss those claims without prejudice.

Melgaard resists this conclusion for two reasons, neither of which are persuasive.

First, he contends that Wisconsin would be responsible for paying a judgment in his favor only because it has chosen to indemnify state employees. *See* Dkt. 41, at 7–9; Wis. Stat. § 895.46(1). Melgaard is correct that a state's decision to indemnify its employees, by itself, "does not transform a suit against individual defendants into a suit against the sovereign." *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 779 (7th Cir. 1991). The fact that a state indemnifies its employees is irrelevant to the sovereign immunity analysis "because it is the voluntary choice of the state, not a cost forced on it by the federal-court suit." *Luder*, 253 F.3d at 1023 (citations omitted). But even when states indemnify their employees, courts faced with individual-capacity claims against state employees still must consider whether the claims "may really and substantially be against the state." *Id.* If they are, then those claims are barred by sovereign immunity. *See Kraege v. Busalacchi*, No. 09-cv-352-vis, 687 F. Supp. 2d 834, 837 (W.D. Wis. 2009) (Crabb, J.).

Second, Melgaard contends that the individual-capacity claims in *Omosegbon* and *Haynes* were barred by sovereign immunity because the plaintiffs in those cases sought back pay, a form of equitable relief. *See* Dkt. 41, at 10–11. Melgaard says this case is different because he seeks only legal relief, namely compensatory damages for lost income, injury to his personal reputation, mental and emotional distress, as well as punitive damages. *See id.* But the type of relief doesn't matter. When a plaintiff's individual-capacity claims are effectively against the

9

state, claims for relief against the state are barred by sovereign immunity, even if that relief is compensatory in nature. *See Gerlach*, 95 F.4th at 500–01.

Melgaard's First Amendment retaliation claims against Harrenstein and Peery are barred by sovereign immunity. The court will dismiss those claims without prejudice.

### B. Title VII claim against DNR

Melgaard purports to bring a retaliation claim against DNR under Title VII. *See* Dkt. 15, ¶ 503; Dkt. 41, at 26–28.[1] But he concedes that none of DNR's three actions were sufficiently adverse to support a Title VII retaliation claim on their own. *See* Dkt. 41, at 22. In the retaliation-claim context, courts generally consider each alleged retaliatory act to determine whether it is sufficiently adverse. *See Lewis v. Wilkie*, 909 F.3d 858, 868 n.3 (7th Cir. 2018).

But Melgaard wants the court to consider the cumulative effect of DNR's allegedly retaliatory actions. *See* Dkt. 41, at 27. *Lewis* suggests that the cumulative effect is best understood as a retaliatory hostile work environment claim rather than a retaliation claim. For a hostile work environment claim, the question is "whether the aggregate effect of all [three] incidents constituted a 'sufficiently severe or pervasive' hostile environment." *Lewis*, 909 F.3d at 868 n.3. Melgaard must show that DNR's actions were "so severe or pervasive so as to affect the terms and conditions of employment." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018); *see Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty.*, 893 F.3d 372, 375 (7th Cir. 2018) (per curiam).

---

[1] In their opening brief, defendants say that "Melgaard intends to claim constructive discharge." Dkt. 31, at 30. But Melgaard disavows that he is bringing a constructive discharge claim in his opposition brief, describing the constructive discharge issue as strictly a remedies question. *See* Dkt. 41, at 28.

The terms and conditions of Melgaard's employment never changed. Melgaard received modest negative feedback three times after he violated a DNR policy. It is undisputed that (1) DNR determined that no formal disciplinary action was warranted following its investigation into Melgaard; (2) Melgaard's title, supervisory role, compensation, and benefits all remained the same following his Letter of Expectations; and (3) Melgaard's work responsibilities did not change, and he was not placed on an improvement plan after his negative performance review. No reasonable jury could find that three minor incidents over the course of ten months constituted the kind of severe and pervasive harassment that would affect the terms and conditions of Melgaard's employment. Melgaard's retaliatory hostile work environment claim fails.

ORDER

IT IS ORDERED that:

1. Defendants Wisconsin Department of Natural Resources, Bryan Harrenstein, and Jeremy Peery's motion for summary judgment, Dkt. 26, is GRANTED. Plaintiff Michael Melgaard's First Amendment retaliation claims against Harrenstein and Peery are dismissed without prejudice. Melgaard's retaliatory hostile work environment claim against DNR is dismissed with prejudice.

2. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered November 24, 2025.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge